FILED
08/12/2019
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 6, 2018 Session

**TARENCE NELSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 10-02396      Chris Craft, Judge**
_____

**No. W2017-02063-CCA-R3-PC**
_____

The petitioner, Tarence Nelson, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received effective assistance of counsel at trial and on appeal. The petitioner argues trial counsel was ineffective for failing to turn over certain firearms to law enforcement for testing, failing to request funds to hire a ballistics expert, and failing to request oral argument on direct appeal. Separately, the petitioner alleges numerous, additional errors of trial counsel amounted to ineffective assistance under the cumulative error doctrine. The petitioner also contends post-conviction counsel was ineffective. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and TIMOTHY L. EASTER, JJ., joined.

Vicki M. Carriker, Memphis, Tennessee, for the appellant, Tarence Nelson.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Melanie Cox, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

A. Trial

The petitioner was convicted of two counts of premeditated murder for which he received two consecutive life sentences. *State v. Tarence Nelson*, No. W2011-02222-

CCA-R3-CD, 2013 WL 12185279 (Tenn. Crim. App. May 24, 2013), *no perm. app. filed*. This Court affirmed his convictions and sentence on appeal and summarized the facts presented at trial, as follows:

The victim, Tonya Johnson, was 36 years old at the time of her death. She was eight months pregnant with [the petitioner]'s child. Kaye Ingram lived across the street from the victim. She described the victim as a "quiet neighbor" who "kept to herself." On September 25, 2009, Ms. Ingram observed Ms. Johnson arrive home at approximately 5:00 or 5:30 p.m. Ms. Ingram testified that Ms. Johnson left her garage door open, which was unusual because "she never ever leaves her garage door up so [she] assumed that she probably had company coming." At approximately 6:00 p.m., Ms. Ingram went outside to watch her grandchildren ride their bikes on the sidewalk. She saw a black car pull into Ms. Johnson's driveway. She described the driver of the vehicle as a black male, between 5 feet 7 inches and 6 feet in height. He was wearing blue jeans and a white shirt. He entered the house through the garage. Ms. Ingram saw him leave Ms. Johnson's house at approximately 9:30 p.m.

Ms. Ingram and her husband decided to go to Ms. Johnson's house to tell her that her garage door was open. They knocked on her front door, and she did not answer. Ms. Ingram looked through the window beside the front door and saw Ms. Johnson "slumped over her ottoman." She yelled to another neighbor, Dixie Harber, to call 911.

Dixie Harber lived across the street from Ms. Johnson. She and her husband left their home at approximately 6:30 or 7:00 p.m. to eat dinner. She noticed that Ms. Johnson's garage door was open. After they returned home from dinner, she was sitting in her garage when she saw the Ingrams walk across the street and knock on Ms. Johnson's front door. She then heard Ms. Ingram yell at her to call 911.

Justin Grimsley, Ms. Ingram's son-in-law, described the vehicle in Ms. Johnson's driveway as a dark blue or black four-door late model sedan. Mr. Grimsley left Ms. Ingram's house to go to the store at approximately 9:30 p.m., and the car was still in Ms. Johnson's driveway. When he returned 15 minutes later, the car was gone. He walked to Ms. Harber's house to talk to Ms. Harber and her husband, who were sitting in their driveway. When Ms. Ingram yelled to Ms. Harber to call 911, he ran across the street to Ms. Johnson's house. He and the others entered Ms. Johnson's house through the garage door leading into the kitchen. They

- 2 -

found Ms. Johnson lying across an ottoman in her living room. They checked for a pulse and did not find one. They rolled her onto her back, and Mr. Grimsley checked for a pulse on Ms. Johnson's neck but did not feel one. He then ran across the street to Ms. Ingram's house to get a respiration mask. He gave the mask to another neighbor on the scene, Steve Starnes, who tried to resuscitate Ms. Johnson while Mr. Grimsley did chest compressions until paramedics arrived. Mr. Grimsley testified that Ms. Johnson appeared to have one gunshot wound in the back of her head and one gunshot wound to her abdomen. He testified that he did not observe any signs of a struggle inside the victim's house.

Deputy James Hogan, of the Shelby County Sheriff's Office, responded to the crime scene. He found shell casings near the victim's body. Deputy Hogan searched the victim's house. He testified that there "didn't appear to be anyone else there or anything disturbed even." After the paramedics arrived and left with the victim, he interviewed the neighbors and secured the crime scene.

Paramedic Vicki Jeffers testified that the victim was deceased when she arrived at the scene. She continued CPR on the victim and called for helicopter transportation in order to try and save the life of the victim's unborn child. Ms. Jeffers testified that the victim had wounds to the back of the head, the right chest, and the abdomen.

Detective Jason Valentine, of the Shelby County Sheriff's Office, testified that he executed a search warrant for the victim's house. Detective Valentine found a 9 millimeter shell casing near the chaise lounge. He testified that there were no weapons recovered from the victim's home. After the autopsy revealed that the victim had two gunshot wounds and only one projectile was recovered from the victim's body, Detective Valentine returned to the crime scene to search again. Another projectile was recovered from the leg of the chaise lounge.

Sergeant Trini Dean was the case officer in the investigation. Sergeant Dean interviewed witnesses who stated that the victim had arrived home at approximately 6:00 p.m. Witnesses gave a description of a black male who was seen entering the victim's residence "a few minutes" later. Sergeant Dean also interviewed the victim's family members and determined that [the petitioner] matched the description of the subject. Sergeant Dean's investigation revealed that [the petitioner] was visiting a girlfriend named Amanda in Memphis on the date of the murders.

Amanda Hill testified that she and [the petitioner] began dating each other in 2005, and they dated until February, 2007. They remained friends after their romantic relationship ended. On September 25, 2009, [the petitioner] drove from his home in Murfreesboro to Memphis to visit Ms. Hill. [The petitioner] told Ms. Hill that he would leave work at 5:00 p.m., and she expected him to arrive at her house at approximately 9:00 p.m. [The petitioner] arrived at her house at 10:00 p.m. She testified that [the petitioner] was carrying a laptop and a cell phone, and he had an empty gun holster in the back of his waistband. They ate, watched a movie and then went to bed.

[The petitioner] was arrested on September 26, 2009, and transported to the Rutherford County Adult Detention Center. Lieutenant Todd Sparks, of the Rutherford County Sheriff's Office, assisted in obtaining and executing a search warrant for [the petitioner]'s residence in Murfreesboro on September 27, 2009. Lieutenant Sparks found two firearms in [the petitioner]'s kitchen in the "open space on top of the cabinets." One was a Bushmaster AR-15 .223 caliber rifle, and the other was a Taurus .44 Magnum revolver.

Sergeant Chris Owens, of the Rutherford County Sheriff's Department, also assisted in executing the search warrant. Sergeant Owens found "several loose ammunition rounds" inside a clear plastic container in a storage compartment of a boat parked inside [the petitioner]'s garage. Sergeant Owens testified that the container held "several rounds of .40 caliber ammunition inside." He also found a nylon briefcase inside the storage compartment of the boat that contained "several different types of miscellaneous ammunition to include-I don't have a certain-an exact count but there were 12 gauge rounds and some 9 millimeter rounds as well." Sergeant Owens also found "a magazine for a semiautomatic rifle style weapon and a clip or a holster for a handgun."

Detective Nathan Cockman, of the Shelby County Sheriff's Department, also assisted in executing the search warrant for [the petitioner]'s home. A rented black Chevy Impala was beside the boat parked in [the petitioner]'s garage. Detective Cockman found an empty cell phone case with a "flowery" design inside the center console of the vehicle. Detective Cockman also found a rental agreement for the Impala inside the center console. Detective Coleman went to the location from which the car was rented and found [the petitioner]'s Chevy Tahoe.

- 4 -

Detective Cockman found a 9 millimeter shell casing and a .40 caliber shell casing inside the center console of the Chevy Tahoe.

Agent Cervinia Braswell, a forensic scientist for the Firearms Identification Unit of the Tennessee Bureau of Investigation (TBI), testified that she examined the 9 millimeter shell casing recovered from the victim's home and the 9 millimeter shell casing recovered from [the petitioner]'s vehicle. Agent Braswell determined that the two shell casings had the same class characteristics, but they had insufficient individual characteristics to "make a conclusive identification" that they were fired from the same weapon.

Assistant Medical Examiner Lisa Funte performed an autopsy of the victim. Dr. Funte testified that the victim suffered two gunshot wounds, one to the head and another to the abdomen. Dr. Funte determined that the victim was between 35 and 37 weeks pregnant and that the fetus was viable at the time of the victim's death. Dr. Funte described the gunshot wound to the victim's head. The entrance wound was on the right side of the victim's head behind the ear. The bullet went through the soft tissue and muscles, down along the scalp and exited through the right side of the victim's neck. The bullet reentered the victim's chest and through soft tissue and muscle and then fragmented and made two exit wounds. Dr. Funte testified that the bullet "really didn't hit anything that would be immediately lethal[,]" damaging only subcutaneous muscle tissue. Dr. Funte found no soot or stippling around the wound entrance. She determined that the bullet was fired from greater than four feet away.

Dr. Funte testified that the gunshot wound to the victim's abdomen was a "rapidly fatal injury." The bullet entered the right side of the victim's abdomen and lodged in the muscle tissues of the back near the shoulder. Dr. Funte concluded that the victim died from multiple gunshot wounds and the manner of death was homicide. Dr. Funte testified that the fetus died from utero-placental insufficiency due to lack of oxygen caused by the victim's death.

Eric Douglas testified that he had been friends with the victim since 2005. He identified the cell phone case found in [the petitioner]'s rental car as having belonged to the victim. Vicki Stewart, a sonographer at the victim's doctor's office, also identified the cell phone case as having belonged to the victim. Ms. Stewart testified that she had been performing weekly ultrasounds on the victim since early August. Ms. Stewart had seen

the victim for an appointment in the afternoon on the day the victim was murdered. The victim told Ms. Stewart that "she was meeting the baby's father" for dinner. Ms. Stewart testified that the victim "seemed rather distressed at that time" and that she "just seemed like she was not looking forward to it."

[The petitioner] testified and admitted that he shot the victim. However, he stated that she "was trying to shoot [him]." [The petitioner] testified that he met the victim online approximately four years prior to trial. He lived in Memphis at that time. [The petitioner] testified that when the victim learned that he was dating another woman, "it really wasn't a big deal." The victim contacted the other woman, and [the petitioner] and the other woman did not talk again. [The petitioner] and the victim continued their relationship. On another occasion, [the petitioner] was having drinks with another woman at his house when the victim came in. The victim told the other woman to leave. [The petitioner] testified that "[i]t wasn't a big commotion or pow wow[,]" and the other woman "politely left." The victim and [the petitioner] continued their relationship. [The petitioner] testified there were "several [more] incidents." On one occasion, a woman named Shayla was at [the petitioner]'s house at "3:00 or 4:00 in the morning." [The petitioner] heard the victim "kicking and beating and screaming" at the front door for "probably an hour, two hours nonstop." The same woman stayed at [the petitioner]'s house again, and the victim "had her car boxed in, . . . and wouldn't let her leave." [The petitioner] testified that there were "so many incidents" in which the victim "would . . . come over and harass [him] or the person [he] was with[,]" that he moved to another residence. On one occasion when Trella King was at [the petitioner]'s house, [the petitioner] heard what he thought was a gunshot and saw the victim standing outside of his house. On another occasion, Amanda Hill was at [the petitioner]'s house. They were sitting at the kitchen table having breakfast. [The petitioner] saw the victim drive by his house and he closed the window blinds. [The petitioner] had an "uneasy feeling." He opened the front door, and the victim "c[ame] bashing through the front door." The victim was "picking up stuff and throwing it at [the petitioner]." [The petitioner] tried to restrain her, and he called the police. He testified that he was injured during that incident. On another occasion, a woman named Pamela Young was at his house when the victim arrived there. [The petitioner] answered the door, and the victim "didn't say anything . . . She just came in punching [him], kicking [him], and she was just rapidly, consecutively punching [him]." [The petitioner] did not hit the victim but tried to restrain her.

- 6 -

[The petitioner] testified that he maintained a relationship with the victim because he "knew why she was upset." He testified, "I couldn't get mad at her for what was going on so I just kind of accepted that, you know, if you're going to deal with this woman and you're going to continue to see other women, this type of action is going to be a side effect. And I guess because we had known each other so long, I was just willing to deal with it."

[The petitioner] worked providing technical support as a consultant for several companies in Memphis. He later accepted a job with Tractor Supply Company in Brentwood. He moved to Murfreesboro in December, 2007. [The petitioner] testified that he only saw the victim on two occasions in 2009. In February or March, 2009, while the victim was visiting [the petitioner], she told him that she was pregnant. [The petitioner] testified that his reaction was "neutral." [The petitioner] testified that after the victim returned to Memphis, she sent a text message to him that she was not pregnant. [The petitioner] had no other discussions with the victim about the pregnancy.

On September 25, 2009, [the petitioner] left work early to drive to Memphis to visit the victim and others. He rented a vehicle because his vehicles were not reliable enough for the trip. [The petitioner] testified that he was "going to see whoever [he] could see . . . going to do whatever [he] could do while [he was] in Memphis type of deal." He sent a text message to the victim while he was shopping in some of his favorite stores in Memphis. The victim responded and invited him to her house. She told [the petitioner] that she would leave the garage door open. [The petitioner] got stuck in traffic and became lost on his way to the victim's house, and he arrived at 6:45 p.m. He entered the house through the garage. He testified that the victim opened the door and walked back into the house without speaking to him. He sat beside her on the couch and spoke to her, but she did not respond.

When [the petitioner] told the victim that he was not going to stay the night at her house, the victim "verbally lashe[d] out" at [the petitioner]. [The petitioner] and the victim were arguing when Amanda Hill called [the petitioner] on his cell phone. The victim told [the petitioner] that she was going to kill [the petitioner] and Amanda Hill. The victim left the room, and [the petitioner] heard cabinet doors slamming and the victim yelling. The victim came back into the living room and threw condoms at [the

petitioner]. She sat down again and threw her cell phone at [the petitioner]. [The petitioner] reached down to pick up the phone, and the victim yelled, "look at me [bitch]." When [the petitioner] looked up at the victim, she was pointing a gun at his head. [The petitioner] "froze." [The petitioner] heard the victim pull the trigger, but the weapon did not fire. He heard her pull the trigger twice more, but it did not fire. After [the petitioner] saw the victim remove the clip, put it back in the gun and manually cock the gun and point it at [the petitioner] again, [the petitioner] pulled out his 9 millimeter pistol that he was carrying in a concealed holster and fired it at her. [The petitioner] grabbed the items around him, including both firearms, and ran out of the house. [The petitioner] testified that he did not check to see if the victim was injured. He circled the neighborhood three or four times and contemplated going back to the house, but he decided not to and "left the scene completely." [The petitioner] drove to Amanda Hill's house and stayed the night.

[The petitioner] testified that after the incident, while he was driving to Amanda Hill's house, he noticed the gun that the victim had pointed at him lying in the seat of his car, and he realized that it was his Sig Sauer that had been in the glove compartment of the rental car. [The petitioner] apparently did not recognize the gun as belonging to him during the incident inside the victim's home. The following morning, after [the petitioner] and Amanda Hill had breakfast together, [the petitioner] returned to the victim's house to return the victim's laptop and cell phone. He saw a pickup truck parked outside and he left. [The petitioner] testified that he later hid the victim's laptop, phone, the Sig Sauer and the 9 millimeter handgun "under a barn in Murfreesboro" because he had heard that the police wanted to talk to him. [The petitioner] acknowledged that he had prior convictions for theft of property.

Amanda Hill, Pamela Young, Trella King, and Shayla Grant also testified on behalf of [the petitioner] about the incidents in which the victim was involved. Ms. Hill testified about the incident in which the victim went to [the petitioner]'s house while Ms. Hill was present, and Ms. Hill heard "all this scuffling, screaming, [and] glass breaking," and the police responded. Ms. Young testified about an incident in which the victim went to [the petitioner]'s house while Ms. Young was present. Ms. Young testified that the victim "was either bamming on the door or ringing the door bell[,]" and [the petitioner] stepped outside to talk to the victim. Ms. Young testified, "in the blink of an eye [the victim] had broke through the door and was in the bedroom and they were arguing and [the victim] struck

[the petitioner] with her fist." She saw the victim strike [the petitioner] "a couple of more times." She testified that she did not see [the petitioner] strike the victim, but she testified, "after that last strike [the petitioner] picked her up and body slammed her on the kitchen floor." Ms. Young then left [the petitioner]'s house. Ms. Young testified that "three or four weeks" after that incident, the victim came to her house around 5:00 or 6:00 a.m. and rang the doorbell. Ms. Young went outside with a baseball bat, and the victim began "backing away and [saying] that she [wa]s not trying to start anything. She just wanted [Ms. Young] to know that [the petitioner] was with her the day before." Ms. King testified about an incident when she was at [the petitioner]'s house, and the victim "would not let [her] leave." She testified the victim blocked her car in the garage until the police were called. Ms. Grant testified that she was spending a weekend with [the petitioner] when the victim arrived at 3:00 or 4:00 a.m. and was knocking on the doors and windows. She heard [the petitioner] and the victim arguing outside. Ms. Grant testified that the victim went to [the petitioner]'s residence on two other occasions while Ms. Grant was visiting, and the victim and [the petitioner] argued.

*Tarence Nelson*, 2013 WL 12185279, at *1-5.

## B. Post-Conviction Hearing

After this Court affirmed the judgments of the trial court, the petitioner filed a timely pro se petition for post-conviction relief. After the appointment of counsel, the petitioner filed an amended petition, arguing, in part: trial counsel failed to provide pre-trial discovery to the petitioner; trial counsel failed to comprehensively review the petitioner's testimony with him; trial counsel failed to present characteristics of the HK USP 9 millimeter firearm used in the shooting; and trial counsel failed to request oral argument on direct appeal.

At the subsequent evidentiary hearing, trial counsel and the petitioner both testified. The petitioner testified that trial counsel represented him throughout the trial and direct appeal. He first met with trial counsel a week before his preliminary hearing was scheduled and, after speaking with trial counsel, decided to waive the hearing. The petitioner requested a copy of the discovery, but trial counsel never provided it to him. The petitioner explained trial counsel did not want "that information in my jail cell." Despite trial counsel's concerns, the petitioner continued to request a copy of the discovery, but he did not receive it until "a few months after [the petitioner] was in prison."

The petitioner's defense theory was that he had acted in self-defense. The petitioner testified at trial in order to establish his defense but claimed trial counsel did not prepare him well and did not fully advise him of the perils of cross-examination. Because he was unprepared, the petitioner omitted numerous details which would have aided his defense. However, when asked if he could provide those details at the post-conviction hearing, the petitioner stated, "[n]ot off the top of my head I can't."

The petitioner also claimed trial counsel should have called more witnesses to testify regarding the victim's acts of aggression and violence towards the petitioner. The petitioner agreed the four witnesses called at trial supported his theory of self-defense, but he felt there were more witnesses that should have been called. However, the petitioner admitted he did not provide trial counsel with the names of these individuals but "[thought] his parents did." He also failed to provide their names at the post-conviction hearing.

The petitioner and trial counsel never discussed seeking funds for expert services such as ballistics testing, and the petitioner stated he was unaware such was a possibility. He now believed a ballistics expert could have shown the victim shot at the petitioner, necessitating self-defense. However, the petitioner presented no evidence during the hearing to support this theory.

The petitioner informed trial counsel, and testified at trial, that he rented a car to travel to Memphis because his regular vehicle was "broken down" and being serviced. The petitioner provided trial counsel with an estimate for the repairs to his car and a receipt for his rental car. According to the petitioner, trial counsel should have used the estimate and receipt to rebut the State's theory that the petitioner drove to Memphis in a rental car established premeditation. The petitioner introduced both documents as exhibits during the post-conviction hearing.

Further, the petitioner claimed trial counsel should have introduced the petitioner's phone records to negate premeditation. He testified the phone records would have shown he contacted several people in Memphis prior to contacting the victim. The petitioner was not aware of trial counsel's issuing a subpoena for the records, nor did he recall trial counsel's reviewing the records with him in an effort to discuss their usefulness at trial.

The petitioner also testified trial counsel should have tested the alleged murder weapon to determine if it had a hair trigger. According to the petitioner, he hid the HK USP 9 millimeter used in the shooting, along with a shotgun, the victim's cell phone and computer, and the firearm the victim allegedly possessed during the shooting. Prior to trial, the petitioner told trial counsel he hid the items under a shed in Murfreesboro. Upon receiving this information, trial counsel went to the shed and retrieved two

firearms. The petitioner insisted one of the firearms was the 9 millimeter he used to shoot the victim and alleged trial counsel should have had the gun tested for a hair trigger and presented it as evidence at trial. The petitioner, however, did not introduce the firearm retrieved by trial counsel at the post-conviction hearing to substantiate his allegation that it was the murder weapon.

The petitioner recalled the prosecution made statements during closing argument which the petitioner felt lacked evidentiary support, including that the petitioner murdered the victim because he knew she was pregnant and wanted to prevent the birth. The petitioner testified trial counsel failed to object to that allegation.

When asked how much time went into preparing for his sentencing hearing, the petitioner responded, "I'm not sure." He testified trial counsel met with him once prior to the sentencing hearing. According to the petitioner, trial counsel failed to advise him he could allocute and express his remorse without being cross-examined during the hearing.

The petitioner testified he expected to have oral argument on direct appeal based on trial counsel's assurances. He later discovered trial counsel failed to request the same on appeal.

Trial counsel also testified at the post-conviction hearing. Trial counsel stated he reviewed the discovery with the petitioner and the petitioner "helped [him] through the discovery in making everything jell." Customarily, trial counsel would provide a copy of the discovery to the client if requested, but testified he had concerns about people having access to the discovery in the jail cell.

When asked about the petitioner's trial testimony, trial counsel stated, "I thought he was doing fine. I don't remember telling him to get off the witness stand. But I often tell my clients the best way to do this is get on and off the witness stand as quickly as you can." He further testified it is rare to have a defendant testify on their own behalf and do a good job. When asked about preparing the petitioner to testify, trial counsel felt he "prepped [the petitioner] fairly well." He acknowledged he "probably could have prepped him better. But there comes a point at which you've prepped somebody as much [as] they're going to be prepped."

Regarding the character witnesses, trial counsel believed the testimony offered about the victim's propensity for violence sufficiently bolstered their theory of self-defense. He "thought it went beautifully" and worked as an element of surprise.

Trial counsel testified he did not see a need for a ballistics expert at trial. He disagreed with the petitioner's testimony about the need for a ballistics expert to look for

the victim's DNA on the bullet, stating he "didn't see how that would make any difference whatsoever."

Regarding the rental vehicle, an Enterprise representative testified at trial that the petitioner frequently rented vehicles from Enterprise. Trial counsel could not recall whether the petitioner provided receipts as proof the petitioner's vehicle was inoperable. When asked if such receipts would have bolstered the petitioner's testimony that he rented the car not with intent to murder the victim but because his car was inoperable, trial counsel testified, "[i]t could have. I can't say."

Trial counsel did not see a need to produce the petitioner's phone records at trial. He testified that "I think what [the petitioner] wanted from the phone records was that he was calling these other people when he was in Memphis and those people testified." As such, there was no need to introduce the phone records because the proof needed was introduced through live witnesses.

When asked about the firearms he retrieved from under the shed in Murfreesboro, trial counsel could not recall whether one of the firearms was the alleged murder weapon but noted he thought he found "a 44 millimeter handgun and there was a pistol grip shotgun 12 gauge." After telling the petitioner he retrieved two firearms from the shed, the petitioner told trial counsel the gun used to shoot the victim had a hair trigger. As a result, trial counsel fired the handgun to test it for a hair trigger but he "didn't find anything improper with the trigger." Trial counsel, however, could not recall if the petitioner told him one of the guns he found under the shed was the murder weapon. At the hearing, trial counsel stated the firearms were currently at his house.

Further, trial counsel testified when he searched under the shed he "was expecting to find not so much the firearms, but a laptop computer." He recalled the petitioner told him there was a laptop computer "that had some information on it that . . . had to do with emails that [the petitioner] received from the victim, a lot of emails that would have been consistent with the type of contact that the four witnesses testified to at trial."

Regarding the failure to request oral argument on appeal, trial counsel testified, "I don't believe I've ever requested an oral argument in [s]tate [c]ourt." He agreed the goal was to have an oral argument on appeal but noted he did not file a motion requesting argument after learning the case was set to be heard on brief.

After its review of the evidence presented, the post-conviction court denied relief, and this timely appeal followed.

***Analysis***

On appeal, the petitioner argues trial counsel was ineffective for retrieving the firearms and not disclosing them to authorities or turning them over to be tested, failing to request funding for a ballistics expert, and failing to request oral argument for the direct appeal. The petitioner also argues trial counsel was ineffective under the cumulative error doctrine by alleging numerous, additional errors. Finally, the petitioner argues he received ineffective assistance of post-conviction counsel. The State contends the post-conviction court correctly denied the petition as the petitioner failed to meet his burden. Following our review of the record and submissions of the parties, we affirm the judgment of the post-conviction court.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. *Dellinger v. State*, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 688-89. Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

When reviewing trial counsel's performance, this Court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). The fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper v. State*, 847

S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is given to sound tactical decisions made after adequate preparation for the case. *Id.*

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); *see Dellinger*, 279 S.W.3d at 293-94. On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. *Id*. Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. *Id*. at 457.

## I.  Trial Counsel

### A. Disclosure of Firearms

The petitioner argues trial counsel was ineffective when he retrieved the firearms allegedly used in the crimes and failed to disclose the firearms to authorities or turn them over to be tested. Specifically, the petitioner argues trial counsel violated Tennessee Code of Professional Conduct 3.4 by concealing the firearms he retrieved, which the petitioner contends were material evidence. The State argues the petitioner waived these claims for failing to raise them in his petition. Notwithstanding waiver, the State argues the petitioner has failed to show deficient performance or prejudice related to the firearms issues.

The petitioner argues trial counsel violated Tennessee Rule of Professional Conduct 3.4 and Tennessee Code Annotated section 39-16-503 by allegedly concealing the firearm used in the shooting, preventing the petitioner from receiving a full and fair trial. The petitioner did not raise this argument at the post-conviction hearing. The only argument raised at the post-conviction hearing regarding trial counsel's possession of the firearm was that trial counsel was ineffective for failing to present characteristics of the firearm to the jury. The petitioner cannot raise a new argument for the first time on appeal. *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004). We, therefore, do not address whether trial counsel's conduct with regard to the petitioner's firearms violated our code of ethics. *See* Tenn. Sup. Ct. R. 8, 9; *Maddux v. Bd. of Prof'l Responsibility of Supreme Court of Tennessee*, 288 S.W.3d 340, 343 (Tenn. 2009) (internal citations omitted) ("Included in [the Supreme Court's] duty to regulate the practice of law in this state is the ultimate disciplinary responsibility for violations of the

rules governing the legal profession."); *State v. Maurice Baxter*, No. W2016-01088-CCA-R3-CD, 2018 WL 3860079, at \*17 (Tenn. Crim. App. Aug. 10, 2018) (Woodall, J., concurring) (internal citations omitted) ("It is not the responsibility of this appellate court to hold, in effect, that an attorney has violated any of the Rules of Professional Conduct. Indeed, it is the Tennessee Supreme Court, and the Board of Professional Responsibility of the Supreme Court of Tennessee, which have the sole authority to determine if ethical violations have been committed.").

### B. Ballistics Expert

The petitioner also argues trial counsel was ineffective by failing to request funding or retain a ballistics expert despite having exclusive possession of the murder weapon. The State contends this claim fails to establish deficient performance or prejudice. As to this issue, the post-conviction court made the following findings:

> No proof was put on at the hearing on this petition of what characteristics should have been presented, and this court cannot see how this could have affected the outcome of the trial. The gun used to kill the victim was still in the possession of the attorney at the time of the hearing, as he had been told where it had been hidden by the petitioner after the killing . . . and could have been presented by the petitioner at the hearing as an exhibit and subjected to all manner of tests, but the petitioner chose not to elicit any of this proof at the hearing.

The post-conviction court concluded this allegation failed for a lack of proof of any deficient performance or prejudice to the petitioner. While we agree the petitioner has failed to meet his burden, we also note that the record does not support the trial court's factual determination concerning whether trial counsel possessed the murder weapon. At the hearing, the petitioner testified that the firearm in trial counsel's possession after searching under the shed was a "HK USP 9 millimeter," the same firearm used to shoot the victim. Contrastingly, trial counsel testified the two firearms he found were a "44 millimeter handgun" and a "12 gauge shotgun." Trial counsel also testified the firearm he retrieved and tested did not have a "hair trigger," an alleged characteristic of the firearm the petitioner used to shoot the victim. Based on the conflicting testimony and the fact the firearm at issue was not introduced, the petitioner failed to prove his factual allegation, that trial counsel possessed the murder weapon, by clear and convincing evidence. Thus, the evidence preponderates against the post-conviction court's finding of fact.

Regardless, we do agree with the ultimate conclusion of the post-conviction court. The petitioner argues trial counsel was ineffective for failing to retain a ballistics expert

to test the firearm used in the shooting. The petitioner, however, did not present the firearm in question or the results of any such testing at the post-conviction hearing and, therefore, cannot establish prejudice. *See Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990); *Kelvin Winn v. State*, No. W2016-02200-CCA-R3-PC, 2017 WL 2211423, at *9 (Tenn. Crim. App. May 19, 2017), *perm. app. denied* (Tenn. Sept. 22, 2017). Thus, the petitioner is not entitled to relief on this issue.

## C. Oral Argument on Direct Appeal

The petitioner argues trial counsel was ineffective by failing to submit a written request for oral argument when he filed the brief on direct appeal. "Any party to an appeal who desires oral argument shall so request by stating at the bottom of the cover page of the party's brief that oral argument is requested." Tenn. R. App. P. 35(a). While trial counsel admitted he wished to have oral argument on appeal but failed to request it, the petitioner has not shown that oral argument would have changed the outcome of his appeal. Accordingly, the petitioner has failed to establish prejudice and is not entitled to relief on this issue. *See generally*, *William James Watts v. State*, No. M2015-024110-CCA-R3-PC, 2016 WL 6638856, at *6 (Tenn. Crim. App. Nov. 10, 2016), *perm. app. denied* (Tenn. Feb. 16, 2016). ("The petitioner presented no evidence to suggest that appellate counsel's failure to request oral argument affected the outcome of his appeal.").

## D. Cumulative Error

The petitioner argues the following errors by trial counsel, taken cumulatively, amount to ineffective assistance of counsel. We will address each alleged error in turn. The petitioner claims trial counsel failed to provide him with pre-trial discovery. Both the petitioner and trial counsel testified they reviewed the discovery together and trial counsel expressed concern with the petitioner about having a copy of the discovery in his jail cell. While the petitioner claimed he continued to ask for discovery after that conversation, trial counsel testified the petitioner did not ask again. In its order denying post-conviction relief, the post-conviction court specifically found trial counsel's "testimony credible." We will not second-guess the trial court's credibility determination. *Fields*, 40 S.W.3d at 456. The petitioner next argues trial counsel failed to put on evidence regarding the fact the petitioner's vehicle needed repairs and rented a car for that reason, but trial counsel explained he presented a witness from Enterprise who testified at trial about the petitioner's frequent car rentals. While trial counsel could not remember whether the petitioner provided him with a copy of the estimate to repair the petitioner's vehicle, the petitioner has failed to show how he was prejudiced by the omission of that additional piece of information especially in light of the testimony the petitioner regularly rented cars for his travels. The petitioner also claims trial counsel failed to present evidence of the victim's violence towards the petitioner to show he acted

in self-defense. At the hearing, trial counsel disagreed, stating he presented four character witnesses to this effect, each of whom trial counsel believed testified successfully for the defense. Additionally, the petitioner failed to present additional witnesses to support this claim at the hearing. The petitioner next argues trial counsel failed to investigate and introduce the petitioner's cell phone records to show he spoke to several people in Memphis before contacting the victim. However, trial counsel stated several witnesses testified at trial to speaking with the petitioner the day of the murder, thus eliminating the need for the records. The petitioner also asserts trial counsel failed to prepare the petitioner to testify in his own defense. Trial counsel again disagreed, stating he prepared the petitioner as best he could and that he thought the petitioner did "fine" during his testimony. Within this context, the petitioner was unable to recall the details he allegedly omitted from his testimony as a result of being unprepared.

Finally, the petitioner argues trial counsel failed to file pre-trial motions, failed to move for mistrial based on statements the State made during closing argument, and failed to prepare the petitioner for the sentencing hearing. The petitioner, however, provided no proof to support any of these claims.

A petitioner cannot succeed on a cumulative error claim when the petitioner cannot show that trial counsel's performance was deficient. *Tarrants Yvelt Chandler v. State*, No. M2017-01539-CCA-R3-PC, 2018 WL 2129740, at \*10 (Tenn. Crim. App. May 9, 2018), *perm. app. denied* (Tenn. Sept. 13, 2018). Having found no deficiency as to any of the aforementioned issues, the petitioner is not entitled to relief.

## II.    Post-Conviction Counsel

Finally, the petitioner argues he received ineffective assistance of post-conviction counsel. This is not a cognizable claim. This Court may only grant post-conviction relief when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. There is no constitutional right to the effective assistance of post-conviction counsel. *Stokes v. State*, 146 S.W.3d 56, 60 (Tenn. 2004); *House v. State*, 911 S.W.2d 705, 712 (Tenn. 1995). The petitioner acknowledges this in his brief and instead relies on a statutory right to counsel in post-conviction proceedings. *See* Tenn. Code Ann. § 40-30-107(b)(1). While there is a statutory right to counsel in post-conviction proceedings under Tennessee law, the statutory right does not entitle a party to relief on a claim for ineffective assistance of post-conviction counsel. *Frazier v. State*, 303 S.W.3d 674, 680 (Tenn. 2010); *Jonathan Everett v. State*, No. W2013-020330-CCA-R3-PC, 2014 WL 3744498, at \*4 (Tenn. Crim. App. July 28, 2014), *perm. app. denied* (Tenn. Nov. 19, 2014). The petitioner is not entitled to relief on this issue.

*Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE